Thank you, Your Honor. If you have any trouble hearing me, please let me know. I'm assuming I'm good for now. My name is Daniel Kaplan. I'm representing the appellant Alexander Oriho. I'm going to be watching the clock. I will attempt to save about two minutes for my rebuttal time. The lead issue presented in this appeal was a jurisdictional argument, just confirming that there is jurisdiction in this court for an order that is not one that terminates the entire case. The government has agreed that jurisdiction is proper as an appeal from what is effectively an injunction under 1292A1. Unless the court would like to address that, I'm going to proceed on to the merits. The merits relate to a Fifth Amendment question of self-incrimination, which I believe I can demonstrate is an issue and a problem here in two easy steps. Step one is that the fact is that transferring funds that are derived from health care fraud in foreign commerce is a crime under 18 U.S.C. 1957, under which there are seven charges in this indictment in this case. Step two is that if you are compelled to repatriate from abroad funds that were transferred in foreign commerce, you are effectively being compelled to prove an element of that crime. So this is a classic example of what this court and the Supreme Court have identified as an act, which implies an assertion of fact. And that fact is what, Mr. Gamble? You are essentially making that assertion of fact. These are funds I transferred. Now, it doesn't prove the whole crime, obviously. It still has to be proven those came from fraud, but it proves part of the crime. And the Fifth Amendment protection provides you can't be compelled to prove any part of a crime against yourself. So why wouldn't the government's promise of use immunity protect you from that charge? Well, the most fundamental problem with that approach is that the Supreme Court in the Doe case, there's two Doe cases in the briefing. This is the Doe case that's 465 U.S. 605. And in that case, it was exactly the same situation. The government said, well, we promise not to use this against the defendant. And the Supreme Court said that would be a sort of constructive use immunity that's just between the prosecutor and the court. And Congress has not allowed that to be a way of granting immunity. Congress has specified in 18 U.S.C. 6002 and 6003 a specific procedure and empowered specific executive officials to grant immunity. And it's only certain people in the Department of Justice who can decide to ask for a grant of immunity. And so the procedure that was suggested in Doe and firmly rejected is precisely what has been suggested here. So that's the most basic problem is the authority to grant immunity is exclusive to certain officials, none of whom were involved in that offer or suggestion in this case. So your position is that the government cannot contractually enter into agreement with the endorsement of the court that would sufficiently protect your client through immunity? Yes, I think that's clearly what the Supreme Court in Doe held. There's additional cases following Doe, which I cited in brief, but that's simply what Congress has specified. There is a further problem. Even if hypothetically a line prosecutor and a district judge could together come up with some immunity, which is not barred by acts of Congress, it still would be far from adequate here because it would not nearly be coextensive with the degree of the constitutional protection. The agreement the government suggested was, well, we won't use it in our case in chief. And if you look at excerpts of record page 66, the government expressly says, we certainly think we could use it. I'm paraphrasing here. What they said, quoting was the government may use evidence of the repatriation in rebuttal and cross-examination. So even in this very trial, they're reserving the right to use this self-incriminating act against Mr. Aredo. And that sets apart the fact that outside of this trial, repatriating this huge amount of money covered by the order could lead to many more charges that could be a link in the chain of evidence leading to entirely new prosecutions. And would your position be the same if the government was seeking the repatriation order after your client was convicted? Yes, absolutely. Because he would, if he were convicted, he'd be convicted of certain charges dealing with certain alleged facts or by that point proven facts, let's say. But the protection of the Fifth Amendment extends to any possible additional charges to evidence that might not be used against him, but could be a link in the chain leading to other evidence which could be used against him. And it protects against prosecution by other sovereigns, by state governments. So none of that protection would be provided. What could the government do that would satisfy you and satisfy them? Is there any relief you can find? Yes. What's acceptable would be a formal grant of immunity following the dictates of 18 U.S.C. 6002 and 6003. The Supreme Court in Kastigar said that is coextensive with the constitutional protection. And that would be adequate. That would protect all use and derivative use and prosecution by any sovereign. And then if that was granted, your client would essentially bring the money back home, put it in the hands of the government. Well, at that point, the Fifth Amendment objection should be nullified. I can't I can't guarantee what my client would do. But but I I'm agreeing that because the Supreme Court says that statutory protection extends to the full extent of the constitutional protection, then that should address the Fifth Amendment issue. You know, certainly there's a possibility disputes could still erupt because you have cases like the Hubble case, which which is discussed in the briefs where statutory immunity was granted. And a huge amount of material was provided pursuant to that grant of immunity. And yet there was still a major dispute that went all the way to the Supreme Court about the government having gone ahead and the special prosecutor having gone ahead and prosecuted that person using evidence that was derived from that production pursuant to immunity. And, you know, disputes can still erupt. But if but if all goes according to how it should go, that immunity should provide adequate protection. At this point, I'm going to save the balance of my time for rebuttal. Thank you. Hernandez. Thank you, Your Honors. May it please the court. Rachel Hernandez on behalf of the United States. The order here was based on probable cause and its consequences were limited by restrictions on the government's use of the information. And I want to be clear. That's not entirely true, is it? You're the order includes information that may be in the possession of the government that may or may not have been presented to the grand jury because the grand jury returned an indictment only as to some of the funds, about seven hundred and sixty thousand, even though it alleges a total loss to the government in excess of seven million. So why wouldn't this story be or I guess compel the Fifth Amendment rights to repatriate? You may very well identify accounts and or banks where some of the money went that the government does not currently know about. And why wouldn't that incriminate? Well, Your Honor, I think as to. You are correct that the grand jury found up to seven hundred and sixty thousand in the international money laundering, the government proffered in its motion for this order, this repatriation order, that it had evidence and bank records up to two point four million. The proffer wasn't challenged. So the court below and this court can accept that that there's sufficient probable cause up to the two point four million. I will grant you up to this. Mr. Kaplan asked for a hearing and the district court didn't afford hearing. So is it your position that simply saying in your moving papers that you have some additional evidence that may or may not have been presented to the grand jury that Mr. Kaplan's probable cause for all seven point three million dollars? I would say a couple of things. The the amount that I think that the government proffered is the two point four. So the seven sixty was presented to the grand jury and then the government in its motion proffered that it had records supporting two point four million. The matter was fully briefed. There was actually a motion for reconsideration after the defense felt that there was were new points brought up in the government's reply. So the matter was fully briefed. The issue of the amount, the two point four million was not disputed. And I think this court or the district court could accept a proffer on that as to that amount. I want to be clear. What about the five million? What do we do? What do we do with the five million dollar difference? Is it the government? Are you now offering that the government also has records with regard to bank accounts involving the five million? Or is that going to be new information that the government is about if Mr. Orego complies with the court's order? I do not believe the government has records to support the seven million. I think that the court's order was based on the probable cause finding by the grand jury. But I would agree with you. We do not have records beyond the two point four million. And that is why you're seeking this case, the two point four or the whole shebang seven. I think the government, I think it's reasonable to say because we have the record supporting the two point four million. I think that is the amount that I think we can justify at this point. I want to be clear. I reached out to defense counsel last week to suggest mediation in this case. The government does not intend to use this information it at trial in on direct on cross on rebuttal. The government does not intend to seek new charges. And to the extent those statements are clearer than they were at the district court, I reached out to opposing counsel to see whether mediation may be appropriate because of the situation that we're all working under, including his inability to have some discussion with his client. We weren't able to resolve it. The government remains open to that. Nevertheless, we believe that the court's order that this was not compelled test to be was proper. I refer you to page four of the court's order, starting at line nine and running to line 14. As I read the use of immunity that Timothy Law ordered here, government is only promising that it will not use this evidence in its case in chief. It doesn't say anything about using it for rebuttal, using it for cross-execution if Mr. Orheo testifies. So it looks to me that that immunity is not co-extensive with use and derivative use immunity as the statute requires. To the I agree, your honor, and to the extent that it differs, I think as preparation for oral argument and review of particularly Mr. Kaplan's reply brief, I think that it is appropriate to say the government would agree to not use it at all in its case and would not use it to seek new charges. And I do take issue with Mr. Kaplan's assertion that the government cannot give an informal immunity. In the Joe case, the Joe case, 465 U.S. 605, there's two Joe cases where the court talked about immunity. That was in a pre-charging situation where I think it would be very difficult to be able to track whether the government was making any sort of use of financial information, derivative use. Here, the defendant has been charged. We are not going to seek additional charges based on any information derived from the repatriation. In fact, we've suggested that the information be turned, the funds be turned over to the marshals, not the prosecution or investigation team to further insulate any information that could be derived from it. Did you seek authorization through the special unit of the criminal division and main justice before you made this promise of use immunity to Mr. Kaplan? Whether the trial team did or I don't believe the government. Do you have authority from main justice to make this offer so that it's coextensive with the immunity that's provided by statute? I do not believe main justice has been consulted, but prosecutors do have the ability to give pocket immunity, informal immunity and. But in the absence of a court immunity order, Mr. Kaplan's response is that doesn't give my client protection from prosecution by other authorities besides the United States Attorneys Office, the District of Arizona. Isn't that correct? Well, that is correct, Your Honor. However, that's that's correct. I guess my I would say that it was not sought below. That was not the issue raised. The defendant didn't say I would do this, but this pocket immunity isn't good enough. I need formal immunity. Mr. Nance, why should why shouldn't we send this case back to the district court for an evidentiary hearing to flesh out the record for the missing five million and the documents pertaining to it, as well as resolving these immunity concerns? I think that would be fine, Your Honor. I think it could be fleshed out perhaps better than it is at this point. But I would just like to point out that what the district court did here is similar to how district courts in other places have handled this. And I point the court to the cases cited in the briefing, Adams, Sellers, Morrison, where district courts ordered repatriation under similar circumstances. And of course, those are not binding on this court, but I think are good exemplars of how district courts have handled this. The problem I have with those cases is that they really don't address a fundamental factual difference here, which is that if the government only has bank records for two point four million out of a seven. How is it that the government in order, Mr. Orheo, to identify new bank accounts that it doesn't have any information about in the process of repatriating the funds? In those other cases, the government either through its own independent efforts had identified where the funds were located or the defendant was ordered to sign a very general consent to access information relating to his records without specifying what banks and what accounts the funds might be in that the government was not previously aware of. And I couldn't find a case on point that really addresses our situation. I think that the district court based its order on a general probable cause finding by the grand jury. As I said, the government proffered and has records as to two point four million out of the total. I think that repatriation occurs in cases routinely. When we have MLATs, mutual legal assistance treaties with countries, we are able to repatriate the funds. In this situation, the defendant sent his money to countries where we do not have that. There should be an avenue for the government to repatriate these funds. Otherwise, there's a clear message here of how to be able to hang on to your fraudulent proceeds. To the extent that this court feels that a better record could provide more information here, I don't disagree and would not have a problem having this remanded for that purpose. Okay. All right, Mr. Kaplan. I think you have a couple minutes left. You're on mute. Sorry about that. You can hear me now, I think. So I want to first address this assertion that the government made a proffer or even proffered records. According to Mr. Hernandez, that is absolutely not the case. The only thing the government has ever done in respect to the $2.4 million or anything beyond the $760,000 that the grand jury found is to make a completely unsupported, bare assertion in a motion that the government currently knows that $2.4 million are transferred. How that can be described as a proffer, I don't really agree with. And in fact, the only thing that defense has ever done is to oppose the granting of a motion to repatriate and argue that the court should not grant that. Would you be open to that kind of a proffer if Mr. Hernandez gave it to you today? Well, if the government wanted to try to prove what the district court found without evidence, which is that it's a foregone conclusion that a certain amount was transferred, then they would be called upon to make that sort of a proffer. And of course, you know, if that were to happen, we would address that. And if the proffer really showed it was a foregone conclusion, according to the standard of this court, which is that it makes the showing with reasonable particularity, then that could address some part of the objection to the repatriation order. So if you call it a proffer, are you challenging the repatriation as to the $760,000? He will be effectively turning over more specific information that's incriminating because the indictment does not include the identification of the accounts in Africa where the money is held. And because he's doing this from federal custody, everything he does is monitored. He would effectively be handing over to the prosecution that account information. Is that relevant to the charges, the specific account information, as opposed to where the accounts are located? It would be part of the incriminating information against him to show that he engaged in these transactions. It would be a piece of the incriminating information. So yes, we believe that the protection would extend to that information. And just briefly, as far as this, the government's position that what is being called pocket immunity, I submit pocket immunity is nothing more or less than another nickname for constructive immunity, which until the Supreme Court said is absolutely not permitted. It's contrary to the exclusive authorities Congress says put forth in the immunity statute. There are no further questions. Thank you. Thank you, counsel. The case of United States v. Arijo is submitted.
judges: Siler, Tallman, Hunsaker